1
2
3
4          UNITED STATES DISTRICT COURT

5          NORTHERN DISTRICT OF CALIFORNIA

6              SAN JOSE DIVISION

7

8  ELIZABETH MADRIZ and JOSE LUIS          Case No.  5:13-cv-05096-EJD
   MELGOSA MADRIZ,

9              Plaintiffs,               **ORDER DENYING DEFENDANTS'
                                         MOTION FOR SUMMARY JUDGMENT**
10        v.
                                         Re: Dkt. No. 119
11  KING CITY POLICE DEPARTMENT, et
   al.,

12             Defendants.

13

14        Plaintiffs Elizabeth Madriz ("Ms. Madriz") and Jose Luis Melgosa Madriz ("Mr. Madriz")

15  filed the instant civil rights action against Defendants King City, King City Police Department,

16  County of Monterey, Monterey County Sheriff's Office ("MCSO"), and various law enforcement

17  officials, alleging the violation of their constitutional rights pursuant to 42 U.S.C. § 1983.

18  Presently before the court is a Motion for Summary Judgment filed by the County of Monterey,

19  MCSO, and Monterey County officials (collectively, "Monterey County Defendants"). See Mot.,

20  Dkt. No. 119.

21        Federal jurisdiction arises pursuant to 28 U.S.C. §§ 1331 and 1343.  This matter was found

22  suitable for decision without oral argument pursuant to Civil Local Rule 7-1(b), and the associated

23  hearing was previously vacated.  Having carefully considered the parties' arguments and evidence

24  on the record, the court DENIES the Monterey County Defendants' Motion for Summary

25  Judgment for the reasons explained below.

26

27

28

## I.   BACKGROUND

### A.   Factual Background

On April 11, 2012, the King City Police Department obtained a search warrant for Plaintiffs' house located in King City, including an endorsement allowing for night service.  <u>See</u> Dkt. No. 119, Decl. of Commander Garrett B. Sanders ("Sanders Decl."), Ex. 2.  The warrant permitted the search of Plaintiffs' 19-year-old son Julio ("Julio"), Plaintiffs' home, and all vehicles on the premises.  <u>See id</u>.  The property to be seized included: marijuana and related paraphernalia; personal property establishing and documenting sales of marijuana; and firearms.  <u>See id</u>.

On the same day, after obtaining the search warrant, King City Sergeant M. Baker sent a request letter to the MCSO SWAT Commander for a SWAT team to assist in serving "a high risk Narcotic search warrant" at Plaintiffs' house, and requested "the warrant be a dynamic entry so the narcotics are not destroyed."  <u>See</u> Sanders Decl., Ex. 1.[1]  The request letter listed four known occupants of the residence, including: (1) Julio, who was the suspect; (2) 46-year-old Mr. Madriz; (3) 44-year-old Ms. Madriz; and (4) Plaintiffs' 16-year-old son.  <u>See id</u>.  The request letter provided a brief history of the investigation, stating that for the last three to four months, King City narcotic officers had been investigating the sales of methamphetamine at Plaintiffs' house, and had been told that Mr. Madriz was distributing large amounts of methamphetamine and shipping assault rifles to Mexico.  <u>See id</u>.  The request letter provided that Julio was selling marijuana out of the house to high school students, and had been seen carrying a handgun on his person and vehicle.  <u>See id</u>.  The request letter also provided that a shotgun and rifles had been seen in Plaintiffs' house, that Mr. Madriz was a member of a Mexican drug cartel, and that Julio

---

[1] Plaintiffs object to this this exhibit offered by the Monterey County Defendants on the grounds that the document provides no date of production, the person that created it, or any other foundational information.  <u>See</u> Opp'n at 21.  Plaintiffs also contend that this record was previously designated confidential under the protective order, and is now filed without complying with the protective order.  <u>Id</u>.  The court OVERRULES Plaintiffs' objection to the extent that such document will be used by the court only to provide guidance as to what information the Monterey County Defendants purportedly knew about Plaintiffs' house and its occupants.  The court will not evaluate the truthfulness of the statements contained therein.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    and his 16-year-old brother were known gang member associates.  See id.  Lastly, the request

2    letter provided that Mr. Madriz was "not Police friendly," since one of the King City police

3    officers had gone to his place of business and Mr. Madriz had told the officer to "Get the fuck

4    out;" and the 16-year-old was "also not police friendly" since he had previously resisted arrest.

5    See id.

6        After obtaining the request letter, MCSO conducted a background check on the occupants

7    of the house in order to prepare for the operation.  Sanders Decl. at ¶ 7.  The background check

8    revealed that Mr. Madriz and his 16-year-old son had a criminal history that included weapons

9    convictions and resisting arrest convictions.  Id.[2]

10       Subsequently, MCSO formulated an "Operation Plan" to assist the King City Police

11   Department in serving the search warrant at Plaintiffs' house on April 18, 2012.  See Sanders

12   Decl., Ex. 3.  The Operation Plan states as its mission: "To successfully execute a Night Service

13   Endorsed Search Warrant on the target's residence, and suspect named in the warrant.  Once all

14   occupants of the residence(s), outbuilding(s) and the yard are secured, the location will be turned

15   over to the King City PD to complete the service of the warrant."  See id.  As to the execution, the

16   Operation Plan states that the SWAT team will brief with the King City Police Department at the

17   Central Station at 1:00 a.m., they will leave for Plaintiffs' house at 3:00 a.m., and will service the

18   warrant at about 4:00 a.m.  See id.  When they arrive at Plaintiffs' house, the Gas Team will

19   silently make their way to the bathroom windows, set up ladders next to the bathroom windows,

20   and deploy gas, or chemical agents, if someone runs to the bathroom to destroy evidence.  See id.

21   The Entry Team will silently go to the house, conduct knock and notice, breech the door if it is

22   locked, and deploy a diversionary device prior to entering the house.  See id.  The armored vehicle

23   BEARCAT will set up in front of the house and provide cover for the team.  See id.  Once the

24

25   _____

26   [2] Plaintiffs object to Exhibit 5 attached to the Declaration of Commander Sanders, that is offered
     by the Monterey County Defendants, on the grounds that such document was printed for the
     purposes of this litigation, was not produced to Plaintiffs, and no adequate foundation has been
27   laid.  See Opp'n at 21.  The court OVERRULES Plaintiffs' objection because the court did not
     rely on this exhibit for its analysis.

28
     Case No.: 5:13-cv-05096-EJD
     ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1    residence and occupants are secured, the SWAT Commander will call the King City Police

2    Department to take over the scene.  See id.

3           Moreover, the Operation Plan states that a deputy may use deadly force to: (1) "protect

4    himself/herself or others from what he/she reasonably believe would be an imminent threat of

5    death or serious bodily injury;" and (2) "to stop a fleeing suspect when the deputy has probable

6    cause to believe" that the suspect intends to commit a felony involving an infliction of serious

7    bodily injury or death, "and the deputy reasonably believes that there is an imminent or future

8    potential risk of serious bodily injury or death" if the suspect is not apprehended.  See id.

9           On April 18, 2012, the SWAT team served the search warrant at Plaintiffs' house.  When

10   the SWAT team arrived to the house, it is unclear what prompted the Gas Team to deploy

11   chemical agents.  Nonetheless, it is undisputed that the Gas Team deployed such chemical agents

12   into two bathrooms, firing through the bathroom windows.  See Dkt. No. 125 at 4-5.  The SWAT

13   team opened the front door to the house, which allowed the fumes from the chemical agents to

14   flow through the house and exit the front door.  See id. at 5.  Five occupants began to exit the

15   house through the front door—the four original occupants and Julio's girlfriend.  See id. at 5-6.

16   Thereafter, the occupants were taken into custody, moved to the front yard grass area, put to the

17   ground, and handcuffed behind their backs.  See id. at 6.  Once the occupants were handcuffed,

18   they were moved to the curb, and the SWAT team entered the house to search for any other

19   individual remaining in the house.  See id. at 6-7.  Later, the occupants were turned over to the

20   King City Police Department.  See id. at 6, 9.

21          On April 26, 2012, the SWAT team prepared an After-Action Report.  See Sanders Decl.,

22   Ex. 4.  The report provides a list of the SWAT team personnel involved, and a timeline of the

23   operation as the events occurred, prepared by the Hostage Negotiation Team ("HNT").  See id.

24   The report provides that the SWAT team and armored vehicle BEARCAT arrived at Plaintiffs'

25   house at approximately 3:50 a.m.  See id.  According to the report, by 4:03 a.m., it was confirmed

26   that all persons were removed from the house, and at 4:13 a.m., the King City Fire Department

27   Engine arrived at the house to provide aid and place fans within the house to dispel gas.  See id.

28

United States District Court
Northern District of California

4

1    The report further states that during the clearing of the house, a loaded 12-gauge shotgun with

2    extra rounds on the stock was located in the bed of Plaintiffs' 16-year-old son; and during a

3    debrief with Mr. Madriz, he stated he was trying to locate the shotgun and his .45 cal pistol but

4    was unable due to the gas exposure.  See id.

5         **B.    Procedural History**

6         Plaintiffs commenced this action on October 31, 2013, alleging the violation of their civil

7    rights under the Fourth Amendment.  See Dkt. No. 1.  In December 2013, the Monterey County

8    Defendants filed a motion to dismiss.  See Dkt. No. 27.  In March 2014, Plaintiffs filed a First

9    Amended Complaint, and the Monterey County Defendants subsequently filed a motion to strike

10   the First Amended Complaint.  See Dkt. Nos. 44, 48.  In May 2014, the court granted the

11   Monterey County Defendants' motion to strike and motion to dismiss.  See Dkt. No. 65.

12        Plaintiffs subsequently filed a Second Amended Complaint, which is the operative

13   complaint, alleging the following claims: (1) Section 1983 claim for violation of Plaintiffs' First

14   and Fourth Amendment rights; (2) Section 1983 claim under a theory of Monell liability; (3)

15   Section 1983 claim under a theory of ratification; (3) claims under 42 U.S.C. §§ 1981, 1985, 1986;

16   and (4) various state-law claims asserted under California law.  See Dkt. No. 67.  The Monterey

17   County Defendants filed a motion to dismiss, which in September 2014, the court granted in part

18   and denied in part.  See Dkt. Nos. 74, 86.  The court allowed only the following claims to proceed:

19   (1) Plaintiffs' Section 1983 claim against the Monterey County Defendants for the alleged

20   violation of their Fourth Amendment rights; and (2) all claims against King City.  See Dkt. No. 86

21   at 14.

22        In September 2015, the Monterey County Defendants filed the instant motion for summary

23   judgment.  See Dkt. No. 119.  This matter has been fully briefed.  See Opp'n, Dkt. No. 123;

24   Reply, Dkt. No. 126.

25        Since the filing of the instant motion, Plaintiffs, King City, King City Police Department,

26   and King City officials have reached a settlement agreement.  Thus, in November 2015, the parties

27   filed a joint stipulation dismissing these defendants with prejudice, which the court granted.  See

28

Case No.: 5:13-cv-05096-EJD
ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

1    Dkt. Nos. 128-29.  As such, the only defendants remaining in this action are the Monterey County

2    Defendants, and the only claim remaining is a Section 1983 claim for the alleged violation of

3    Plaintiffs' Fourth Amendment rights.

4    **II.     LEGAL STANDARD**

5           A motion for summary judgment or partial summary judgment should be granted if "there

6    is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of

7    law."  Fed. R. Civ. P. 56(a); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).

8    The moving party bears the initial burden of informing the court of the basis for the motion and

9    identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, or

10   affidavits that demonstrate the absence of a triable issue of material fact.  Celotex Corp. v. Catrett,

11   477 U.S. 317, 323 (1986).

12          If the moving party does not satisfy its initial burden, the nonmoving party has no

13   obligation to produce anything and summary judgment must be denied.  Nissan Fire & Marine Ins.

14   Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1102-03 (9th Cir. 2000).  On the other hand, if the

15   moving party does meet this initial burden, the burden then shifts to the nonmoving party to go

16   beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial."

17   Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324.  The court must regard as true the opposing party's

18   evidence, if supported by affidavits or other evidentiary material.  Celotex, 477 U.S. at 324.

19   However, the mere suggestion that facts are in controversy, as well as conclusory or speculative

20   testimony in affidavits and moving papers, is not sufficient to defeat summary judgment.  See

21   Thornhill Publ'g Co. v. GTE Corp., 594 F.2d 730, 738 (9th Cir. 1979).  Instead, the non-moving

22   party must come forward with admissible evidence to satisfy the burden.  Fed. R. Civ. P. 56(c);

23   see also Hal Roach Studios, Inc. v. Feiner & Co., Inc., 896 F.2d 1542, 1550 (9th Cir. 1990).

24          Where the moving party will have the burden of proof on an issue at trial, it must

25   affirmatively demonstrate that no reasonable trier of fact could find other than for the moving

26   party.  Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  However, where the

27   nonmoving party will have the burden of proof at trial on a particular issue, the moving party need

28
     Case No.: 5:13-cv-05096-EJD
     ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

only point out "that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.  Provided there has been adequate time for discovery, summary judgment should be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Id. at 322-23.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.

## III.   DISCUSSION

Plaintiffs assert a Section 1983 claim against the Monterey County Defendants, alleging the violation of their Fourth Amendment right to be free from "unreasonable searches and seizures."  U.S. Const. amend. IV.  Specifically, Plaintiffs assert that the manner in which the Monterey County Defendants executed the search warrant was unreasonable, and constitutes excessive force.  The Monterey County Defendants now move for summary judgment on two grounds: (1) they are entitled to qualified immunity; and (2) Plaintiffs cannot rely on allegations of a "team effort" in order to establish individual liability.[3]  Each of these arguments will be addressed in turn.

### A.   Qualified Immunity

"Qualified immunity protects government officers from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Maxwell v. Cnty. of San Diego, 708 F.3d 1075, 1082 (9th Cir. 2013).  Analyzing qualified immunity requires a two-step inquiry.  First, "the court determines whether the facts show the officer's conduct violated a constitutional right."  Hopkins v. Bonvicino, 573 F.3d 752, 762 (9th Cir. 2009) (internal quotations omitted).  Second, the court "determine[s] whether the right was clearly established at the time of the alleged unlawful action."  Id. (internal quotations omitted).  Here, it appears the motion focuses only on the second step, thus

---

[3] The Monterey County Defendants also moved for summary judgment as to Plaintiffs' Monell claim, and an issue pertaining to the knock notice requirement.  See Mot. at 11.  Plaintiffs, however, stated that these issues are inapplicable to this case.  See Opp'n at 20.

Case No.: 5:13-cv-05096-EJD
ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1    only that step will be addressed.  See Cameron v. Craig, 713 F.3d 1012, 1021 (9th Cir. 2013)

2    (noting the Supreme Court has "held that lower courts may address the second step alone where it

3    proves dispositive").

4           "For a constitutional right to be clearly established, its contours must be sufficiently clear

5    that a reasonable official would understand that what he is doing violates that right."  Maxwell,

6    708 F.3d at 1082.  In the context of the Fourth Amendment, the "reasonableness of a search or

7    seizure depends not only on *when* it is made, but also *how* it is carried out."  Cameron, 713 F.3d at

8    1021 (emphasis in original) (internal quotations omitted).  Thus, "even when supported by

9    probable cause, a search or seizure may be invalid if carried out in an unreasonable fashion."  Id.

10   "[T]he reasonableness of a particular search or seizure must be assessed by carefully considering

11   the objective facts and circumstances that confronted the involved officer or officers."  Id.

12   (internal quotations omitted).  In making this evaluation, the court must consider the following

13   factors: "(1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to

14   the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or

15   attempting to evade arrest by flight."  Id.

16          At the summary judgment stage, "determinations that turn on questions of law, such as

17   whether the officers had probable cause or reasonable suspicion to support their actions, are

18   appropriately decided by the court."  Hopkins, 573 F.3d at 762-63.  "However, a trial court should

19   not grant summary judgment when there is a genuine dispute as to the facts and circumstances

20   within an officer's knowledge or what the officer and claimant did or failed to do."  Id. (internal

21   quotations omitted).

22                      **i.    Deploying Chemical Agents Into the House**

23          The parties dispute whether the use of chemical agents and the manner in which they were

24   deployed was reasonable.  The Monterey County Defendants argue their use of chemical agents

25   was reasonable because, given the information provided to them by the King City Police

26   Department, they believed the occupants of the house were armed with weapons.  Mot. at 10.

27   They contend the purpose of using the chemical agents was to make the bathrooms inhospitable,

8

Case No.: 5:13-cv-05096-EJD
ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

1   and thereby prevent the destruction of evidence by flushing drugs down the toilet.  Id.

2        Plaintiffs, however, argue that the deployment of chemical agents was unreasonable given

3   there was no threat to officer safety.  Opp'n at 7-8.  Plaintiffs further argue that using a shotgun to

4   fire chemical agents through the bathroom windows was excessive because if it were to hit a

5   person inside the bathroom, that would constitute lethal force.  Id. at 8-9.

6        In reviewing the evidence in the record, it appears the chemical agents were deployed

7   using a device called the BP5, manufactured by Sage, which "is a non-pyrotechnic barricade

8   penetrating munition capable of delivering micro-pulverized chemical agents through barricades

9   from a 37mm rifled launcher."  Dkt. No. 123, Decl. of Steven M. Berki ("Berki Decl."), Ex. K.

10   Also, "[t]he BP5 is designed to penetrate windows, doors, and other barriers."  Id.

11        By the time the Monterey County Defendants executed the search warrant in 2012, the

12   Ninth Circuit had already established that the use of chemical agents and projectile force could be

13   considered excessive force under certain circumstances.  For example, as it pertained to pepper

14   spray, the Ninth Circuit had "held that police officers employ excessive force in violation of the

15   Fourth Amendment when they use pepper spray upon an individual who is engaged in the

16   commission of a non-violent misdemeanor and who is disobeying a police officer's order but

17   otherwise poses no threat to the officer or others."  Young v. Cnty. of Los Angeles, 655 F.3d

18   1156, 1168 (9th Cir. 2011).  The Ninth Circuit also held that "the use of pepper spray may be

19   reasonable as a general policy to bring an arrestee under control, but in a situation in which an

20   arrestee surrenders and is rendered helpless, any reasonable officer would know that a continued

21   use of the weapon or a refusal without cause to alleviate its harmful effects constitutes excessive

22   force."  Headwaters Forest Def. v. Cnty. of Humboldt, 276 F.3d 1125, 1130 (9th Cir. 2002)

23   (internal quotations and emphasis omitted).  Moreover, as it pertained to the use of projectile

24   force, the Ninth Circuit had held that "[e]very police officer should know that it is objectively

25   unreasonable to shoot—even with lead shot wrapped in a cloth case—an unarmed man who: has

26   committed no serious offense, is mentally or emotionally disturbed, has been given no warning of

27   the imminent use of such a significant degree of force, poses no risk of flight, and presents no

28

Case No.: 5:13-cv-05096-EJD
ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1    objectively reasonable threat to the safety of the officer or other individuals." <u>Deorle v.</u>

2    <u>Rutherford</u>, 272 F.3d 1272, 1285 (9th Cir. 2001).

3           To the extent there were no specific cases about a projectile gun that deploys chemical

4    agents, it is a well-established principle that "it is unreasonable to use significant force against a

5    suspect who was suspected of a minor crime, posed no apparent threat to officer safety, and could

6    be found not to have resisted arrest." <u>Young</u>, 655 F.3d at 1168.  Thus, the use of a novel device

7    does not entitle law enforcement officers to qualified immunity if it violates this principle.  <u>See</u>

8    <u>Nelson v. City of Davis</u>, 685 F.3d 867, 884 (9th Cir. 2012) ("As we have previously held . . . an

9    officer is not entitled to qualified immunity on the ground that the law is not clearly established

10   every time a novel method is used to inflict injury.").  On these authorities, the court concludes it

11   was clearly established law that the Monterey County Defendants' use of the BP5 to deploy

12   chemical agents could constitute excessive force.

13          The court will now evaluate whether the circumstances in this case justified the use of

14   force.  The crime at issue could be considered severe since the Monterey County Defendants were

15   executing a high-risk search warrant, and were informed there were weapons in the house.

16          However, there is no indication from the record that Plaintiffs or any occupants posed an

17   immediate threat to the safety of the officers or others.  The Monterey County Defendants arrived

18   in the early predawn hours of morning, at a time when most people would be asleep.  Most

19   importantly, certain Monterey County Defendants admitted in their deposition that there was no

20   immediate threat to the safety of the officers or other citizens at the time of deployment.  <u>See</u> Dkt.

21   No. 123, Berki Decl., Ex. I, Dep. of Humberto Coronado ("Coronado Dep.") at 118-19 (stating

22   that he did not see anybody inside the house holding a weapon, and did not see that any deputy or

23   citizen was in imminent danger of great bodily injury or death); Ex. G, Dep. of Commander

24   Garrett Sanders ("Sanders Dep.") at 93 (stating that no suspects in the house were in the process of

25   threatening imminent death or serious injury to any of the officers when the gas rounds were

26   fired).  Indeed, the Monterey County Defendants have admitted that the purpose of deploying the

27   chemical agents was to prevent the occupants from destroying evidence and not out of safety

28
     Case No.: <u>5:13-cv-05096-EJD</u>
     ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

1  concerns.  See Berki Decl., Ex. F, Dep. of Kevin Monahan at 115 (stating that the reason they

2  employed the gas in the bathroom was to prevent the occupants from destroying evidence).  There

3  is also no indication that Plaintiffs or any other occupant was attempting to flee.  See Sanders Dep.

4  at 93 (stating there was no fleeing suspect who was about to inflict serious injury or death).

5          Furthermore, the Monterey County Defendants knew that the use of the BP5 could

6  constitute lethal force.  This was admitted by certain Monterey County Defendants.  See Berki

7  Decl., Ex. E, Dep. of Michael Darlington at 110-11 (stating that the force options used, such as the

8  Sage gun and barricade projectile, could be considered lethal force); Coronado Dep. at 32 (stating

9  that the BP5 shotgun used to fire the gas rounds is considered a lethal weapon).  The Monterey

10  County Defendants also knew that if aimed at a person, the BP5 could cause serious injury or

11  death.  See Sanders Dep. at 50, 92 (stating that the projectiles could cause serious injury or death if

12  shot at somebody directly); see also Berki Decl., Ex. K (BP5 manufacturer's instructions

13  providing: "[n]ever to shoot directly at a subject as the projectiles could cause serious injury or

14  death.").

15          In considering all facts in the light most favorable to Plaintiffs, the court determines there

16  are genuine issues of material fact as to whether the Monterey County Defendants reasonably

17  understood what they were doing could constitute excessive force.  There are factual issues

18  concerning the reasonableness of the Monterey County Defendants' use of chemical agents when

19  (1) it was the early morning, (2) there was no immediate threat to the safety of the officers or other

20  citizens, and (3) there was no attempt of any of the occupants to flee the scene.  There are also

21  disputed factual issues concerning the reasonableness of the manner in which the chemical agents

22  were deployed, since there is a factual dispute as to whether the BP5 devices were aimed at the

23  bathroom ceilings.

24          ii.    **Custody and Detention of Plaintiffs**

25          The parties also dispute whether the manner in which Plaintiffs were taken into custody

26  and detained was reasonable.  The Monterey County Defendants argue it was reasonable to take

27  Plaintiffs into custody and detain them because they believed there were weapons in the house,

28
11
Case No.: 5:13-cv-05096-EJD
ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1   and doing so was imperative to minimizing the risk to the officers and other members of the

2   community.  Mot. at 7-8.  They further argue that it was a permissible approach to put Plaintiffs

3   onto the ground and handcuff them while they performed a search of the house.  Id. at 9-10.

4   Plaintiffs, however, argue that the Monterey County Defendants used excessive force when they

5   "pulled" Plaintiffs from their home, "threw" them to the ground, handcuffed them, and made them

6   sit out on the curb in the cold predawn early morning while wearing their night clothing.  Opp'n at

7   14-15.

8        By the time the Monterey County Defendants executed the search warrant in 2012, it had

9   been clearly established that when a police officer has the authority to detain a suspect while

10  conducting a search, "the detention must be conducted in a reasonable manner."  Tekle v. United

11  States, 511 F.3d 839, 848 (9th Cir. 2006).  It is an unreasonable detention where the suspect is

12  outnumbered by police officers, is not resisting the officers but is lying face down on the ground,

13  is searched for weapons and is found not to cause concern for the officers' safety, remains

14  handcuffed, and is lifted from behind by the handcuffs.  Id. at 850.

15        Ms. Madriz recounts the events as follows: as she was willingly coming out of the house,

16  she was pushed to the ground by a member of the SWAT team.  Berki Decl., Ex. A, Dep. of

17  Elizabeth Madriz at 51-52.  As she was falling onto the grass, she extended her arms so that her

18  face would not hit the concrete next to the grass.  Id. at 52-53.  While on the ground, certain

19  officers handcuffed her, and then helped her get back up.  Id. at 54.  As all of this was occurring,

20  she saw Mr. Madriz on the ground, and a certain officer was stepping on Mr. Madriz's back as

21  they were handcuffing him.  Id. at 55.  Ms. Madriz told the officer not to step on Mr. Madriz

22  because he had surgery on his back and he was injured, but the officer did not listen to her.  Id.

23  Then, she saw the officer use his knee onto Mr. Madriz's back, and Ms. Madriz again told the

24  officer about Mr. Madriz's back surgery and injury.  Id. at 55-56.  She then saw the officers telling

25  Mr. Madriz to get up from the ground, but when he was unable to get up, the officers grabbed Mr.

26  Madriz by the handcuffs and lifted him off the ground.  Id. at 57.  After Plaintiffs were standing

27  up, they were taken to the curb and were told to sit on the curb.  Id. at 58.  They sat on the curb for

28

United States District Court
Northern District of California

1  about 40 to 45 minutes, until the King City Police Department arrived.  Id. at 64.  Ms. Madriz also

2  stated that the members of the SWAT team were wearing gas masks, black vests, military pants,

3  and had rifles.  Id. at 56.

4         Moreover, it appears from the evidence that Plaintiffs were outnumbered by officers, and

5  were not resisting the officers but were lying face down on the ground as they were being

6  handcuffed.  See Sanders Decl., Ex. 4 (SWAT Team After-Action Report showing a list of 20

7  officers).  There is also no indication that weapons were found on Plaintiffs' person, that there was

8  a cause for concern about the officers' safety, or that Plaintiffs were attempting to flee.

9         In considering all facts in the light most favorable to Plaintiffs, the court determines there

10  are genuine issues of material fact as to whether the Monterey County Defendants reasonably

11  understood that the manner in which they were detaining and holding Plaintiffs in custody could

12  constitute excessive force.  There are factual issues concerning the reasonableness of the Monterey

13  County Defendants' use of force in pushing Plaintiffs to the ground, stepping and kneeling onto

14  Mr. Madriz's back while being informed that he had back surgery and was injured, and lifting Mr.

15  Madriz off the ground by the handcuffs.  There are also factual issues concerning the

16  reasonableness of having Plaintiffs sit on the curb while wearing their night clothing until the King

17  Police Department appeared at the scene.

18         In sum, Plaintiffs' Fourth Amendment right to be free from unreasonable searches and

19  seizures was clearly established at the time the Monterey County Defendants served the search

20  warrant.  However, there are material factual disputes as to whether a reasonable official would

21  understand that what he is doing violates that right.  Given the genuine dispute as to the facts and

22  circumstances within the officers' knowledge, or what the officers did or failed to do, summary

23  judgment would be improper.  Accordingly, the motion for summary judgment as to Monterey

24  County Defendants' entitlement to qualified immunity is DENIED.

25         **B.    Establishing Individual Liability**

26         The Monterey County Defendants also move for summary judgment on the grounds that

27  Plaintiffs cannot establish individual liability because they improperly rely on a theory of "team

28

13

Case No.: 5:13-cv-05096-EJD
ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1  effort." Mot. at 13.  They argue that Plaintiffs have not been able to identify which deputies

2  placed them in handcuffs, cannot offer any description of what the deputies look like, and cannot

3  state how they knew the officers who placed them in handcuffs were part of the SWAT team.  Id.

4      Plaintiffs, however, argue they are not asserting a theory of "team effort."  Opp'n at 16.

5  Instead, they contend that all of the Monterey County Defendants who were on the premises

6  during the execution of the search warrant are integral participants in Plaintiffs' detention, which

7  is sufficient to establish liability under Section 1983.  Id. at 16-17.

8      The Ninth Circuit has "rejected the 'team effort' standard that allows the jury to lump all

9  the defendants together, rather than require it to base each individual's liability on his own

10  conduct."  Hopkins, 573 F.3d at 769-70 (internal quotations omitted).  It has held "that a police

11  officer's being a mere bystander to his colleagues' conduct was insufficient to support § 1983

12  liability."  Id. at 770.  In the alternative, there is the "integral participant" rule, which "extends

13  liability to those actors who were integral participants in the constitutional violation, even if they

14  did not directly engage in the unconstitutional conduct themselves."  Id.  Under this rule, "an

15  officer who does not enter an apartment, but stands at the door, armed with his gun, while other

16  officers conduct the search, can be a full, active participant in the search and therefore can be

17  subject to § 1983 liability."  Id. (emphasis omitted).

18      In this instance, it appears Plaintiffs may be able to establish individual liability through

19  the integral participant rule.  First, it appears the officers who deployed the chemical agents into

20  the home and detained Plaintiffs were members of the Monterey County Defendants' SWAT team,

21  as their names are listed on the After-Action Report.  See Sanders Decl., Ex. 4.  Second, to the

22  extent Plaintiffs are not able to identify the individual officers who handcuffed them, the Monterey

23  County Defendants admit that they, too, do not know the identity of those officers.  See Sanders

24  Dep. at 62 (stating that he directed personnel to take Plaintiffs into custody and detain them, but

25  does not know who, specifically, took them into custody); Berki Decl., Ex. H, Dep. of Andrew

26  Kobayashi at 53 (stating that he did not know who took Plaintiffs into custody).  Given this

27  testimony, it would be unreasonable to expect Plaintiffs to know the identity of the specific

28

14

1    officials who took them into custody if the Monterey County Defendants do not know those

2    identities.  Furthermore, in considering all the evidence, it appears that all the Monterey County

3    Defendants involved in the execution of the search warrant had an active role—from surrounding

4    the house and deploying the chemical agents, to breeching the front door and taking custody of

5    Plaintiffs.

6            In considering all facts in the light most favorable to Plaintiffs, the court determines there

7    is sufficient evidence to support Plaintiffs' theory of establishing individual liability through the

8    integral participant rule.  Accordingly, the motion for summary judgment as to this issue is

9    DENIED.

10   **IV.    CONCLUSION**

11           Based on the foregoing, the Monterey County Defendants' Motion for Summary Judgment

12   is DENIED.

13

14           **IT IS SO ORDERED.**

15   Dated: December 11, 2015

16   

17   EDWARD J. DAVILA
     United States District Judge

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

Case No.: 5:13-cv-05096-EJD
ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT